**AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT**

I, Justin Palmerton, being duly sworn, declare and state as follows:

## I.  INTRODUCTORY INFORMATION

1.   I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since January 2018.  I am currently assigned to a Los Angeles Field Division White Collar Crimes Squad, which is responsible for investigating complex financial crimes. Prior to being employed by the FBI as a Special Agent, I was employed as a Certified Public Accountant at a public accounting firm.  My roles and responsibilities included financial statement audits, tax return preparation, and accounting consulting work.

2.   Since becoming an FBI Special Agent in 2018, I have received 21 weeks of formal training at the FBI Training Academy in Quantico, Virginia.  During the time I have been employed by the FBI, I have participated in investigations relating to wire fraud, mail fraud, and various types of complex financial crimes.  I have participated in many aspects of criminal investigations to include reviewing evidence, analyzing financial documents, conducting physical and electronic surveillance, working with informants, interviewing witnesses and subjects of investigations, and executing search and arrest warrants.

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience,

1

documents and records that were collected and reviewed in the course of this investigation, information that was obtained from interviewed witnesses, and information gathered by other law enforcement officers.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. PURPOSE OF AFFIDAVIT

This affidavit is made in support of an application to seize the following funds on deposit in the following bank accounts (collectively referred to as "SUBJECT ACCOUNTS"):

a. Funds up to $124,500 in First Republic Bank account number 80009045743, held in the name of Anastasiya Rysik ("SUBJECT ACCOUNT 1"),

b. Funds up to $120,000 in First Republic Bank account number 80009045941, held in the name of U.S. Medical Supply Inc. ("SUBJECT ACCOUNT 2"),

c. Funds up to $4,450 in First Republic Bank account number 80008938278, held in the name of Tamara Dadyan ("SUBJECT ACCOUNT 3"), and

d. Funds up to $200,004.75 in First Republic Bank account number 80008938864, held in the name of AM & AM Financial Services, Inc. ("SUBJECT ACCOUNT 4").

2

The SUBJECT ACCOUNTS have been on hold since January 7, 2021 and there have been no funds deposited or withdrawn since that date.

4.     The funds in the SUBJECT ACCOUNTS (the "SUBJECT FUNDS") are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and (b) because there is probable cause to believe that said funds constitute or were derived from proceeds traceable to one or more violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1344 (Bank Fraud), both of which are specified unlawful activities as defined in 18 U.S.C. § 1956(c)(7), Specifically, probable cause exists that the SUBJECT FUNDS represent proceeds from a fraud scheme by which RICHARD AYVAZYAN ("R. AYVAZYAN"), MARIETTA TERABELIAN ("TERABELIAN"), Arthur AYVAZYAN ("A. AYVAZYAN"), TAMARA DADYAN ("DADYAN") and others known and unknown, knowingly submitted or caused others to submit fraudulent loan applications to various lenders, including federally insured financial institutions, and the Small Business Administration ("SBA"), in an attempt to obtain funds authorized by the Coronavirus Aid, Relief, and Economic Security ("CARES") Act.  Based on these fraudulent loan applications, funds were then wired to numerous accounts and deposited, either directly or indirectly through transfers, into SUBJECT ACCOUNTS associated with DADYAN.

5.     To the extent that the SUBJECT FUNDS are not the actual monies traceable to or involved in the illegal

activities identified herein, there is probable cause to believe that said funds are identical property found in the same account(s) as the property involved in the illegal activities, rendering them subject to forfeiture pursuant to 18 U.S.C. § 984.

6.    In addition, the SUBJECT FUNDS are subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. § 982(a)(7) and (b)(1), and 21 U.S.C. § 853(f), because there is probable cause to believe that the SUBJECT FUNDS would, in the event of conviction on the alleged underlying wire fraud and bank fraud offenses, be subject to criminal forfeiture, and an order under 21 U.S.C. § 853(e)(providing for restraining orders and injunctions) would not be sufficient to assure the availability of the property for forfeiture.

### III. BACKGROUND

7.    Based on my training and experience, review of publicly available information, and discussions with other law enforcement agents, I have learned the following regarding the loans at issue.

**A. THE PAYCHECK PROTECTION PROGRAM ("PPP")**

8.    The CARES Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable

loans to small businesses for job retention and certain other expenses, through a program referred to as the PPP. In or around April 2020, Congress authorized over $300 billion in additional PPP funding, and in December 2020, Congress authorized another $294 billion in additional funding.

9.   In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, signed by an authorized representative of the business.  The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees.  These figures are used to calculate the amount of money the small business is eligible to receive under the PPP.  In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

10.   A PPP loan application must be processed by a participating lender.  Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan. Specifically, the lenders enter the PPP application information into the SBA E-Tran system.  The E-Tran

computer server is located in Herndon, Virginia.  If a PPP
loan application is approved, the participating lender
funds the PPP loan using its own monies, which are 100%
guaranteed by the SBA.  The SBA is a United States
government agency based in Washington, D.C.

11.  PPP loan proceeds must be used by the business on
certain permissible expenses, e.g., payroll costs, interest
on mortgages, rent, and utilities.  The PPP allows the
interest and principal on the PPP loan to be entirely
forgiven if the business spends the loan proceeds on these
expense items within a designated period of time after
receiving the proceeds and uses a certain amount of the PPP
loan proceeds on payroll expenses.

B. **THE ECONOMIC INJURY DISASTER LOAN ("EIDL") PROGRAM**

12.  The EIDL program is a Small Business
Administration ("SBA") program that provides low-interest
financing to small businesses, renters, and homeowners in
regions affected by declared disasters.

13.  The CARES Act authorized the SBA to provide EIDLs
of up to $2 million to eligible small businesses
experiencing substantial financial disruption due to the
COVID-19 pandemic.  In addition, the CARES Act authorized
the SBA to issue advances of up to $10,000 to small
businesses within three days of applying for an EIDL.  The
amount of the advance is determined by the number of
employees the applicant certifies having.  The advances do
not have to be repaid.

14.  In order to obtain an EIDL and advance, a qualifying business must submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster.  In the case of EIDLs for COVID-19 relief, the 12-month period was that preceding January 31, 2020.  The applicant must also certify that all of the information in the application is true and correct to the best of the applicant's knowledge.

15.  EIDL applications are submitted directly to the SBA and processed by the agency with support from a government contractor.  The amount of the loan, if the application is approved, is determined based, in part, on the information provided by the application about employment, revenue, and cost of goods, as described above. Any funds issued under an EIDL or advance are issued directly by the SBA.  EIDL funds can be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments. If the applicant also obtains a loan under the PPP, the EIDL funds cannot be used for the same purpose as the PPP funds.

### IV. FACTS SUPPORTING PROBABLE CAUSE FOR SEIZURE

**A. <u>SUMMARY OF SCHEME</u>**

16.  Beginning in or around March 2020 and continuing through at least in or around August 2020, R. AYVAZYAN,

TERABELIAN, A. AYVAZYAN, DADYAN and others known and
unknown, knowingly submitted or caused others to submit
fraudulent loan applications in the names of numerous
business entities to various lenders, including federally
insured financial institutions, and the SBA, and in turn,
received proceeds from disaster loans authorized by the
CARES Act.  Among other things, the fraudulent loan
applications included material misrepresentations about the
applicant's payroll, payroll taxes, number of employees,
and income.  Once the funds were received, in some
instances, disaster loan proceeds were used to purchase
residential properties.  Using disaster loan proceeds as
part of a down payment on a residence for an individual's
personal benefit is also fraudulent and violates the
requirements for the PPP and EIDL.

B. **NOVEMBER 17, 2020 INDICTMENT**

17.  On November 17, 2020, defendants R. AYVAZYAN,
TERABELIAN, A. AYVAZYAN, and DADYAN were indicted by a
federal grand jury in the Central District of California
for violations of 18 U.S.C. § 1349 (conspiracy to commit
bank fraud and wire fraud); 18 U.S.C. § 1343 (wire fraud);
and 18 U.S.C. § 1344(2) (bank fraud), in United States v.
Ayvazyan et al, No. 2:20-CR-00579-SVW.  R. AYVAZYAN was
also indicted for violation of 18 U.S.C. § 1028A
(aggravated identity theft). According to the indictment,
beginning no later than in or around March 2020 and
continuing until at least in or around July 2020, in Los

Angeles County, within the Central District of California, and elsewhere, defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN conspired with one another and with others known and unknown, to commit wire fraud and bank fraud.  Specifically, defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, and other known and unknown conspirators, carried out the objects of the conspiracy, in substance, in the following manner:

a.   Defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, together with other coconspirators, used and caused to be used, stolen, fictitious, or synthetic identities of individuals to submit fraudulent applications for PPP and EIDL loans;

b.   Defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, together with other coconspirators, would use, and cause to be used, stolen, fictitious, and synthetic business names to submit fraudulent applications for PPP and EIDL loans;

c.   Defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, together with other coconspirators, would make, and cause to be made, false statements to the SBA and financial institutions in connection with the fraudulent applications for PPP and EIDL loans, including false representations regarding the number of employees to whom the companies had paid wages and false certifications that the loans would be used for permissible business purposes.

     d.   Defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, together with other coconspirators, would electronically submit, and cause to be submitted, false and fictitious documents to the SBA and financial institutions in support of the fraudulent PPP and EIDL loan applications, including false or fictitious tax documents, payroll records, bank records, and identification documents.

     e.   Defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, together with other coconspirators, would direct that PPP and EIDL loan proceeds be deposited into bank accounts that defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, and their coconspirators controlled.

     f.   Defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, together with other coconspirators, would use the fraudulently-obtained PPP and EIDL loan proceeds for their own personal benefit and for the benefit of their coconspirators, including for expenses prohibited under the requirements of the PPP and EIDL programs, such as the purchase of a residential property in Tarzana, California, and a residential property in Glendale, California.

18.  As part of the conspiracy, between in or around March 2020 and in or around July 2020, defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, together with other coconspirators, submitted and caused the

submission of at least 35 fraudulent PPP and EIDL loan
applications seeking a total of at least $5.6 million in
PPP and EIDL proceeds from the SBA and financial
institutions and received a total of at least $4.6 million
in PPP and EIDL loan proceeds from the SBA and financial
institutions.

C. **U.S. MEDICAL SUPPLY INC. ("U.S. MEDICAL") FRAUDULENT PPP
LOAN APPLICATION — FUNDS TRANSFERRED IN PART TO SUBJECT
ACCOUNT 1 AND SUBJECT ACCOUNT 2**

19.  On or about September 14, 2020, U.S. Medical
applied for a PPP loan through Newtek Finance ("Newtek").
U.S. Medical stated on its PPP loan application that
Anastasiya Rysik ("Rysik") was the loan applicant and sole
business owner. On or about September 16, 2020, Newtek
approved the PPP loan and disbursed $244,500 to U.S.
Medical's BlueVine Bank ("BVB") account ending in x1965
("BVB x1965").

20.  The government's investigation revealed that U.S.
Medical's PPP loan application contained numerous false and
fraudulent representations. For example:

a.  U.S. Medical provided to Newtek as
supporting documentation a copy of a California state
driver's license ("CADL") purported to be for Rysik,
bearing the driver's license number E5288372. I reviewed
records from the California Department of Motor Vehicles
("CA DMV") and learned that this driver's license number
does not exist and there is no record of Rysik in CA DMV
records. As explained below, I believe that Rysik is a

11

synthetic identity utilized to mask the true identity of the PPP loan applicant.

b.   During a search of A. AYVAZYAN and DADYAN's residence, law enforcement identified an identical copy of the fake Rysik driver's license provided to Newtek. Law enforcement also identified a Social Security Card for Rysik bearing the Social Security Number ("SSN") 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 which is identical to the SSN provided to Newtek by U.S. Medical. I believe this indicates that A. AYVAZYAN and DADYAN have control over accounts in the name of Rysik.

c.   U.S. Medical fraudulently misrepresented payroll information to Newtek by inflating employee headcounts.  U.S. Medical's PPP loan application represented to Newtek that U.S Medical was registered in California as a C-Corporation with 22 employees. However, in support of its PPP loan application U.S. Medical submitted to Newtek a payroll report which totaled only 20 individuals.

d.   U.S. Medical fraudulently identified employees to Newtek.  U.S. Medical's payroll report submitted to Newtek in support of its PPP loan application included the alleged employee "Anastasia Baranovska". I reviewed records provided by the SBA and know that on or about May 27, 2020, an individual bearing the name Anastasia Baranovska also applied for and received a $150,000 EIDL loan in the name of Long Canyon Nursery. During a search of R. AYVAZYAN's phone, I viewed a

photograph taken of the SBA website that showed a $150,000 SBA loan was funded to an account in the name of Long Canyon Nursery. I believe this indicates that R. AYVAZYAN has personal identifying information for the alleged employee Anastasia Baranovska, and that U.S. Medical used said employee information to support its fraudulent PPP loan application.

e.   I believe that U.S. Medical supported its fraudulent PPP loan application by providing payroll reports prepared using Gusto software. Gusto is a payroll processing software utilized by businesses to prepare payroll, payroll taxes and payroll reports. I know that A. AYVAZYAN, DADYAN, TERABELIAN and R. AYVAZYAN similarly provided fraudulent Gusto reports in other fraudulent PPP loan applications involving entities previously subject to executed seizure warrants 2:20-MJ-05667 and 2:21-MJ-319. Therefore, I believe that U.S. Medical, as operated by A. AYVAZYAN, DADYAN, TERABELIAN and R. AYVAZYAN, engaged in the same or similar pattern of document fraud.

21.   Investigators obtained and reviewed records from BVB for BVB x1965 and learned that approximately one (1) month prior to applying for a PPP loan, on or about August 12, 2020, U.S. Medical Supply opened BVB account x1965. The only signatory on the account was Anastasiya Rysik. On September 15, 2020, the account had a balance of $200 – the opening balance that initially funded the account.  On September 16, 2020, Newtek deposited $244,500 in BVB x1965

pursuant to U.S. Medical's PPP loan.  Bank records indicate
that the Newtek PPP loan deposit was the first and sole
deposit made to BVB x1965 since the account's opening in
August 2020.

22.  On September 17, 2020, BVB issued a cashier's
check paid to the order of Anastasiya Rysik in the amount
of $244,500, drawn against BVB x1965. On or about October
7, 2020, the cashier's check was deposited into a Bank of
America account ending x5113 ("BOA x5113").  BOA x5113 is
registered in the name of Galileo Financial Technologies
("Galileo"). According to Galileo's website (found at
www.galileo-ft.com), Galileo is a payment processing
company that handles transactions for financial technology
companies. On October 23, 2020, Galileo processed and
deposited the cashier's check to First Republic Bank
("FRB").

23.  As described below, the Investigation determined
that U.S. Medical's fraudulently-obtained PPP loan in the
amount of $244,500 which was initially deposited in U.S.
Medical's account BVB x1965, then transferred by check
deposit to Galileo's account BOA x5113, and then
electronically transferred to FRB, was itself subsequently
split in two transactions, depositing 124,500 of the
fraudulently-obtained funds into SUBJECT ACCOUNT 1 and
$120,000 of the fraudulently-obtained funds into SUBJECT
ACCOUNT 2.

D. **GREEN LABEL NUTRIENRS ("GREEN LABEL") FRAUDULENT EIDL LOAN APPLICATION – FUNDS TRANSFERRED IN PART TO SUBJECT ACCOUNTS 3 AND 4**

24.   On or about May 29, 2020, Green Label applied for a $150,000 EIDL loan with the SBA. Green Label stated on its EIDL loan application that DADYAN was the loan applicant and sole owner of Green Label. On or about July 20, 2020, FINANCIAL ENTITY approved Green Label's EIDL loan and deposited $150,000 into a Bank of the West ("BOW") personal account ending in x0531 ("BOW Green Label x0531"). BOW Green Label x0531 is registered solely to DADYAN.

25.   The government's investigation found that the Green Label EIDL loan application contained numerous false and fraudulent representations. For example:

a.   Green Label stated in its EIDL Loan application that is has been in operation since October 7, 2015, and to be operating in the State of California. I searched the California Secretary of State's publicly-available business entity registration records and determined that Green Label has not registered any form of business entity with the State of California.

b.   Green Label stated in its EIDL loan application that it employed 11 individuals for the 12 months leading up to January 31, 2020. I know that employers need a valid EIN to properly report employee payments to the IRS. Green Label claimed on its EIDL loan application to have an Employee Identification Number ("EIN") of 61-2105827.  This appears in fact to be DADYAN's

personal SSN, 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. Contrary to Green Label's false statement of its EIN on its EIDL loan application, the IRS provided to me Green Label's actual EIN of 85-0971567, which was only issued on May 7, 2020, approximately 12 days prior to Green Label submitting its fraudulent EIDL loan application.  Furthermore, The IRS confirmed that Green Label has never filed any IRS Forms 940 or 941, which would evidence a business having lawfully reported and deposited employment taxes.

26.  Green Label electronically signed the loan agreement using the internet protocol address ("IP Address") 23.242.208.63. I reviewed records provided by Spectrum Communication and leaned this IP Address resolved to DADYAN and A.AYVAZYAN's home address. I know that this IP Address was also used by DADYAN to electronically sign the fraudulent Western Realty loan (discussed below) and by A. AYVAZYAN to electronically sign the fraudulent Allstate Towing and Transport loan.  I believe that the use of the same IP Address indicates that DADYAN and A.AYVAZYAN submitted the Green Label EIDL loan application.

27.  Law enforcement interviewed BOW personnel and learned that BOW previously questioned DADYAN regarding the $150,000 EIDL loan deposit into personal bank account BOW Green Label x0531.  DADYAN told BOW personnel that Green Label had been in operation for a long time. I learned from the California Franchise Tax Board ("CA FTB") that it has

no record of Green Label ever having filed California state
tax returns.

28.  As stated above, BOW Green Label x0531 received
the $150,000 fraudulent SBA EIDL loan proceeds on July 20,
2020. BOW GREEN LABEL X0531, associated with DADYAN, was
subject to a seizure warrant associated with this
investigation filed in <u>United States v. Ayvazyan et al</u>, No.
2:21-MJ-319, and signed January 22, 2021.  Prior to the
seizure of funds in BOW Green Label x0531, Green Label
transferred out the fraudulent $150,000 EIDL loan proceeds
from BOW GREEN LABEL X0531 to SUBJECT ACCOUNT 4 (as
described above, First Republic Bank account number
80008938864).

29.  On July 19, 2020 BOW GREEN LABEL x0531 had an
account balance of $41.75.  On July 20, 2020 the account
received the $149,900 proceeds from the fraudulently-
obtained Green Label PPP loan, raising the account balance
to $149,941.75.  On September 17, 2020, BOW Green Label
x0531 wired $100,000 to SUBJECT ACCOUNT 4, reducing the
account balance to $48,018.88.  Given that the BOW GREEN
LABEL x0531 account did not receive any intervening
deposits between July 20, 2020, and September 17, 2020, the
entire balance of BOW GREEN LABEL x0531 consisted of
fraudulently-obtained Green Label EIDL loan proceeds.
Therefore, the entire $100,000 amount transferred from BOW
GREEN LABEL x0531 to SUBJECT ACCOUNT 4 on September 17,
2020, represented proceeds of the wire fraud scheme

detailed in this affidavit.  As a result of the September 17, 2020 deposit, the $100,000 funds were comingled in SUBJECT ACCOUNT 4 with funds from other fraudulently-obtained loans from the entities Escrow doc ("Escrow"), Six Star Farms ("Six Star"), Secureline Realty ("Secureline"), and Western Lending Group ("Western Lending"), which are described in more detail below.

30.  Prior to September 17, 2020, SUBJECT ACCOUNT 4 had a balance of zero ($0). On September 17, 2020, BOW GREEN LABEL x0531 wired $100,000 in fraudulent funds into SUBJECT ACCOUNT 4, raising SUBJECT ACCOUNT 4's balance to $100,000. On September 17, 2020, but after receipt of the $100,000 in fraudulent funds, $15,000 was wired from SUBJECT ACCOUNT 4 to SUBJECT ACCOUNT 3 (as described above, First Republic Bank account number 80008938278, an FRB account held in the name of DADYAN). The deposited $15,000 was then comingled in SUBJECT ACCOUNT 3 with other fraudulently-obtained loan funds originating from the entities Escrow Doc ("Escrow"), Six Star Farms ("Six Star"), Secureline Realty ("Secureline"), Western Lending Group ("Western Lending"), and ABC Realty, which are described in more detail below.

**E. ESCROW FRAUDULENT PPP LOAN APPLICATIONS – FUNDS TRANSFERRED IN PART TO SUBJECT ACCOUNT 3**

31.  On or about May 8, 2020, Escrow applied for two PPP loans, one through Cross River Bank ("Cross River") and another through Bank of America ("BOA"). Both applications

stated that Roza Avakian ("Avakian") was the PPP loan
applicant and sole owner of Escrow.

     a.  On or about May 14, 2020, BOA approved the
PPP loan application and wired $108,850 into a BOA account
ending x1364 ("BOA Roza x1364") in the name Roza Avakian
Sole Prop.

     b.  On or about June 16, 2020, Cross River
approved the PPP loan application and wired $107,500 into
BOA Roza x1364.

    32.  The government's investigation has revealed
Escrow provided numerous false and fraudulent
representations in both the Cross River and BOA PPP
applications. For example:

     a.  Both Escrow applications provided as
supporting documentation identical IRS Form 940 and Form
941's bearing the EIN 85-0939188. Both Escrow PPP
applications asserted that Escrow filed IRS Form 940s in
2019. I know from information provided by the IRS that
EIN's beginning with the prefix "85" were first assigned in
March 2020 and that Escrow could not have filed IRS Form
940 in 2019 bearing this EIN which was not issued until
March 2020.

     b.  I also believe that the IRS forms 940 and
941 forms provided by Escrow were copied and used for
various fraudulent PPP applications because both IRS Forms
provided by Escrow are identical to other IRS Forms
investigators have reviewed in other fraudulent PPP

applications in this and associated cases. For instance, this investigation found IRS Forms identical to Escrow's forms in A. AYVAZYAN's PPP application for Allstate Towing & Transport, an application that was among the fraudulent loans described in the November 17, 2020 indictment.

       c.   Escrow stated in its PPP loan applications that is has been operating in the State of California. I searched the California Secretary of State's publicly-available business entity registration records and determined that Escrow has not registered any form of business entity with the State of California.

      33.  During a search of A. AYVAZYAN and DADYAN's residence, law enforcement personnel found a California Driver's License ("CADL") in the name of Roza Avakian. I reviewed CA DMV records and learned that this is a fraudulent CADL and that the driver's license number listed is associated with a different person with the last name Avakian. I believe this indicates that A.AYVAZYAN and DADYAN are using Avakian's identity to apply for PPP loans and control accounts in Avakian's name.

      34.  Investigators obtained and reviewed records from BOA for BOA Roza x1364. On or about November 20, 2014, Escrow opened BOA Roza x1364 in the name of Roza Avakian Sole Prop and listed Avakian as Escrow's sole signatory.

      35.  According to BOA May 2020 statement records, the opening BOA Roza x1364 account balance was $210.20. As stated above, BOA deposited the $108,850 PPP loan proceeds

to BOA Roza x1364 on May 14, 2020, raising the account balance to $108,917.70. From May 14, 2020, to June 15, 2020, no deposits were made to BOA Roza x1364.  On June 16, 2020, Cross River deposited $107,500 PPP loan proceeds into BOA Roza x1364, raising the account balance to $215,415.27.

36.  On June 17, 2020, Escrow wired $200,000 from BOA Roza x1364 to an account at Capital One ("CO") in the name of Anna Dzukaeva dba Six Star Farms ending in x1441 ("CO Six Star x1441"). Based on the nominal opening balance to open and fund the account, and the fact that the only deposits made into BOA Roza x1364 originated from fraudulently-obtained PPP loan funds, the entirety of the $200,000 transfer are proceeds of the fraudulent Escrow PPP loans described above.  As further described below, these funds were comingled in the CO Six Star x1441 account with funds from a fraudulently-obtained PPP loan obtained in the name of Six Star Farms ("Six Star"), and then were in part transferred to an account at Wells Fargo Bank ("WFB") in the name of Secureline Realty ("Secureline"), where the funds were comingled with funds derived from a fraudulently-obtained SBA loan in the name of Secure Line, and then in part were transferred to SUBJECT ACCOUNT 3.

**F. SIX STAR FRAUDULENT PPP LOAN APPLICATION – FUNDS TRANSFERRED IN PART TO SUBJECT ACCOUNT 3**

37.  On or about August 13, 2020, Six Star applied for a $244,500 PPP loan through Newtek. Six Star stated on its PPP loan application that Anna Dzukaeva ("Dzukaeva") was

the applicant and sole owner of Six Star. On or about
August 17, 2020, Newtek approved the application and wired
the $244,500 into the Six Star's account CO Six Star x1441.

38.   The government's investigation revealed that Six
Star's PPP loan application contained numerous false and
fraudulent representations. For example:

a.   Six Star submitted a 2020 IRS Form 941 as
supporting documentation that claimed to have been prepared
by Fard Tax & Accounting, Inc. ("Fard Tax"). The IRS Form
941 provided a PTIN, EIN and business address for Fard Tax.
Investigators spoke with Alexander Fard, the owner of Fard
Tax and learned that neither Six Star nor Dzukaeva are Fard
Tax clients. Fard Tax also stated that the PTIN, EIN and
business address provided on the Six Star IRS Form 941 did
not match what Fard Tax utilizes when preparing legitimate
IRS Form 941's for clients.

b.   Six Star submitted with its PPP loan
application a California Driver's License in the names of
Anna Dzukaeva and bearing the number A8002470. I know from
reviewing records provided by the CA DMV that this CADL
number does not exist and there are no records of Anna
Dzukaeva in CA DMV records.

39.   During a search of A.AYVAZYAN and DADYAN's
residence, investigators discovered a CADL in the name of
Dzukaeva bearing the number A8002470. Investigators also
discovered a checkbook for CO Six Star x1441 and
handwritten notes for "Anna D. (Capitol One) 8/28/20

22

Current Balance $383,220". The handwritten notes further describe three checks drawn on the account, one of which was check #456 in the amount of $48,000 to "Secureline". I believe this indicates A.AYVAZYAN and DADYAN are using Dzukaeva's identity to apply for and control accounts in Dzukaeva's name.

40.   Investigators obtained and reviewed records from CO for CO Six Star x1441.  On or about March 21, 2017 Six Star opened CO Six Star x1441 in the name of Dzukaeva with Dzukaeva listed as Six Star's sole signatory.

41.   According to the CO Six Star x1441 June 2020 account statement, CO Six Star x1441's opening balance was $330.62.  There were no deposits in the account between the account opening and June 16, 2020, when Escrow wired $200,000 from BOA Roza x1364 to CO Six Star x1441, raising the CO Six Star x1441 account balance to $200,323.62. As discussed above, investigators determined that the $200,000 transferred from BOA Roza x1364 on June 17, 2020 constituted proceeds from two fraudulent Escrow PPP loans.

42.   Between June 17, 2020, and August 16, 2020, there were no deposits into CO Six Star x1441.  On August 17, 2020, Newtek deposited $244,500 in fraudulently-obtained PPP loan proceeds into CO Six Star x1441, raising the CO Six Star x1441 account balance to $414,538.79.

43.   On September, 24, 2020 Six Star issued check #456 in the amount of $48,000 drawn against CO Six Star x1441. That same day Six Star deposited CO Six Star x1441 check

#456 into a Wells Fargo Bank account ending x1754 in the name of Secureline Realty ("WFB Secureline x1754").

44.   Based on the minimal opening balances, the handwritten notes from A. AYVAZYAN and DADYAN's residence discussing the $48,000 check, and the fact that all deposits consisted of fraudulent proceeds, our investigation determined that virtually all of the $48,000 transferred to WFB Secureline x1754 represent proceeds of the loan fraud scheme described in this affidavit.  As discussed below, the $48,000 is comprised of Escrow and Six Star fraudulent PPP loan proceeds previously comingled in the CO Six Star x1441 account with additional fraudulent Secureline EIDL loan proceeds funds in in part transferred to SUBJECT ACCOUNT 3.

G. **SECURELINE REALTY ("SECURELINE") FRAUDULENT EIDL LOAN APPLICATION – FUNDS TRANSFERRED IN PART TO SUBJECT ACCOUNT 3**

45.   On or about March 31, 2020, Secureline applied for an SBA EIDL loan. Secureline stated on its EIDL loan application that DADYAN was the sole owner of Secureline. On or about June 16, 2020, the SBA approved the EIDL loan and wired $41,400 to WFB Secureline x1754. On June 23, 2020, the SBA wired a $2,000 advance into WFB Secureline x1754. The SBA stated to investigators that this advance was related to the Secureline Realty application.

46.   The government's investigation revealed that Secureline's EIDL loan application contained numerous false and fraudulent representations. For example:

24

a.    Secureline's EIDL loan application stated Secureline's EIN as 61-2105827. This appears in fact to be DADYAN's personal SSN, 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. Furthermore, this EIN is identical to the EIN also provided on Green Label's fraudulent EIDL loan application, discussed above. I know that if a business pays employees, it must have an EIN issued by the IRS and cannot use an SSN to file proper payroll forms with the IRS. The IRS has confirmed both that the EIN listed on Securline's fraudulent EIDL loan application does not exist and that the IRS does not have a record of Secureline Realty filing any IRS 940 or 941 forms at any time.

b.    Secureline stated on its fraudulent EIDL loan application stated that it had two employees. I reviewed records provided by the California Employment Development Department ("CA EDD") and learned that CA EDD had no records of Secureline Realty having any employees.

47.   On or about May 7, 2020, Secureline previously applied for and received a fraudulent PPP loan in the amount of $122,838.  Secureline's fraudulent May 7, 2020 PPP loan was detailed in the November 17, 2020 indictment.

48.   Investigators obtained and reviewed records from WFB for WFB Secureline x1754.  On or about November 20, 2014, Secureline opened WFB Secureline x1754 in the name of Secureline Realty and listed DADYAN as the company's sole owner.  On June 1, 2020, WFB Secureline x1754's account balance was $122,852.74. $122,838.00 of this balance was

proceeds from Securline's fraudulently-obtained PPP loan detailed in the November 17, 2020 indictment.

49.   On June 12, 2020, DADYAN withdrew a $120,010 check from WFB Secureline x1754, leaving a balance of $2,842.74, comprised almost entirely of the PPP loan fraud proceeds.

50.   On June 16, 2020, the SBA deposited $41,400 into WFB Secureline x1754.  On June 23, 2020, the SBA deposited an additional $2,000 into WFB Secureline x1754. Both of these deposits were proceeds of the fraudulently-obtained SBA EIDL loan described above.

51.   From June 23, 2020, to September 22, 2020, there were 42 withdrawals totaling $11,928.47, and three deposits totaling $370.99.  On September 23, 2020 WFB Secureline x1754 had a balance of $82,771.60, virtually all of which represented fraud proceeds.

52.   On September 23, 2020, a $48,000 check bearing the number 456 was deposited into WFB Secureline x1754 from CO Six Star x1441.  As previously described in this affidavit, investigators demonstrated that the $48,000 Co Six Star x1441 funds represented proceeds from two fraudulently-obtained Escrow PPP loans, and a fraudulently-obtained Six Star PPP loan.

53.   From September 23, 2020 to October 19, 2020, there were 10 withdrawals totaling $4,076.46 from WFB Secureline x1754, until a check was drawn on the account in the amount of $70,000. The $70,000 check, bearing the

number "1487" was made payable to "AM & AM Financial Svc. Or Tamara Dadyan" and deposited into SUBJECT ACCOUNT 3.

54.  As of June 13, 2020, Secureline WFB x1754's account balance consisted almost entirely of fraud proceeds.  Investigators traced additional $41,400 and $2,000 fraudulent EIDL loan deposits in June 2020.  In September 2020, CO Six Star x1441 deposited a $48,000 check number 456 into WFB Secureline x1754.  Investigators traced that $48,000 directly to fraudulent loans previously obtained in the names of Secure Line, Escrow, and Six Star. Therefore, investigators determined that the $70,000 WFB Secureline x1754 check number 1487 deposited to SUBJECT ACCOUNT 3 on October 19, 2020, represents proceeds of the described loan fraud in this affidavit.  As described below, the $70,000 funds at issue were then comingled in SUBJECT ACCOUNT 3 with other proceeds from a fraudulently-obtained loan in the name of Western Lending and in part transferred to SUBJECT ACCOUNT 4 (as described above, First Republic Bank account number 80008938864).

**H. WESTERN LENDING ("WESTERN) FRAUDULENT PPP LOAN APPLICATION – FUNDS TRANSFERRED TO SUBJECT ACCOUNT 3 AND THEN IN PART TO SUBJECT ACCOUNT 4**

55.  On or about August 6, 2020, Western applied for a PPP loan through Newtek.  Western stated on its PPP loan application that Ara Haritunian ("Haritunian") was the loan applicant and sole owner of Western Lending. On or about August 10, 2020, Newtek approved the loan and on August 12, 2020, wired $113,700 to an account at US Bank ("USB")

27

account ending x3501 ("USB WLG x3501"), registered in the name of Ara Haritunian dba Western Lending Group.

56.   The government's investigation revealed that the PPP application contained numerous false and fraudulent representations. For example:

a.   Western Lending provided as supporting documentation an IRS Form 940 and IRS Form 941. Both IRS Forms have identical payroll, taxes and employees listed in other IRS Forms investigators have reviewed in other fraudulent PPP applications in connection with their investigation. I believe that the use of identical IRS forms demonstrates a connection between the PPP loan fraud carried out by Western and the other fraudulent loans described in this affidavit. Furthermore, one of the identical IRS Forms was found in A. AYVAZYAN's PPP application for Allstate Towing & Transport, a fraudulent loan described in the November 17, 2020 indictment.

b.   Western submitted with its PPP loan application a signed statement by Haritunian affirming that Western was in good standing with the State of California. I reviewed CA SOS records and found no records demonstrating a relationship between Western and Haritunian. The only Western entity listed was registered in 1983 and is currently suspended by the California Franchise Tax Board.

57.   Western electronically signed the loan agreement using the internet protocol address ("IP Address")

23.242.208.63. I reviewed records provided by Spectrum Communication and leaned this IP Address resolved to DADYAN and A.AYVAZYAN's home address. I know that this IP Address was also used by DADYAN to electronically sign the fraudulent Green Label loan and by A. AYVAZYAN to electronically sign the fraudulent Allstate Towing and Transport loan. I believe that the use of the same IP Address, along with the identical IRS Forms submitted by A.AYVAZYAN for the Allstate Towing and Transport loan indicates that DADYAN and A.AYVAZYAN submitted the Western Lending PPP application.

58.   Investigators obtained and reviewed records for USB WLG x3501. On May 16, 2018, Western opened account USB WLG x3501 and listed Haritunian as Western's sole signatory.  Between August 3, 2020, and August 11, 2020, USB WLG x3501's account balance was $0.63.  On August 12, 2020, Newtek wired $113,700 in fraudulently-obtained PPP loan proceeds to USB WLG x3501, raising the account balance to $113,700.63.

59.   On August, WLG wired $113,000 from USB WLG x3501 from to a USB savings account ending x5185 ("USB WLG x5185") registered in the name of Ara Haritunian dba Western Lending Group.  Subsequently, from August 2020 to October 2020, WLG wired funds from USB WLG x5185 back to USB WLG x3501 in small increments.

60.   On October 23, 2020 a USB WLG x3501 check bearing the number 1001 in the amount of $25,000 check and

29

addressed to "Tamara Dadyan" was deposited by DADYAN into
SUBJECT ACCOUNT 3.

61.  From August 3, 2020 to October 23, 2020 there
were $25,900 in outside deposits into USB WLG x3501.
Investigators determined that 81% of all deposits were
attributed to the fraudulent Western loan
[$113,700/($113,700 + $25,900) = 81%).  Therefore, $20,250
of the $25,000 check is attributable to the fraudulent
Western loan ($25,000 x 81% = $20,250).  The funds
transferred to SUBJECT ACCOUNT 3 were comingled with funds
from other fraudulently-obtained loans as described above,
including loans obtained in the names of Escrow, Six Star,
and Secure Line, and in part, as described further below,
were transferred to SUBJECT ACCOUNT 4 (as described above,
First Republic Bank account number 80008938864).

I.  **ABC REALTY ("ABC") FRAUDULENT PPP LOAN APPLICATION – FUNDS
TRANSFERRED IN PART TO SUBJECT ACCOUNT 4**

62.  On or about April 16, 2020, ABC applied for a PPP
loan through BOA. ABC's PPP loan application stated that
Arsen Dadyan was the loan applicant. Investigators know
that Arsen Dadyan is DADYAN'S brother. On or about May 1,
2020, BOA approved the loan and wired $117,938 to an
account at BOA ending x2061 ("BOA ABC Realty x2061")
registered in the name of ABC Realty.

63.  The government's investigation revealed that the
PPP application contained numerous false and fraudulent
representations. For example:

a.   ABC submitted as supporting documentation a 2019 IRS Form 940 stating that ABC paid $589,623 to employees during 2019. In fact, the IRS asserts that ABC Realty has never filed an IRS Form 940.

b.   ABC also submitted as supporting documentation a 2020 IRS Form 941 stating that in the first quarter of 2020 ABC employed eight individuals and paid the employees $151,842. In fact, the IRS asserts that ABC has never filed an IRS Form 941.

c.   I reviewed records provided by the CA EDD and learned that no records existed of ABC ever having any employees.

64.   Investigators obtained and reviewed records from BOA for BOA ABC Realty x2061.  On or about March 7, 2017 ABC Realty Advisors Inc. opened account BOA ABC Realty x2061 and identified DADYAN as the company's President and the sole account signatory.

65.   On May 1, 2020, BOA ABC Realty x2061 balance was $615.25.  No deposits were made to BOA ABC Realty x2061 between May 1, 2020 and May 3, 2020.

66.   On May 4, 2020 BOA wired $117,938 into BOA ABC Realty x2061 referencing the "Cares Act Paycheck Protection Program".  Between May 5, 2020 and October 20, 2020, other deposits of $183,020 came into the account, for a total of $300,958 deposited into BOA ABC Realty x2061 between May 1, 2020 and October 20, 2020.  On October 19, 2020 a check bearing the number 1148, in the amount of $38,000 was drawn

on BOA ABC Realty x2061 and deposited into SUBJECT ACCOUNT
4.  Investigation determined that the $117,938 deposit on
May 4, 2020, was the loan proceeds from the fraudulently-
obtained PPP loan obtained by ABC Realty described above.
Based on the account balance before the deposit from the
loan, the $117,938 deposit into BOA ABC Realty x2061
represented proceeds of the fraud, and made up
approximately 39% of all deposits into the account during
the relevant timeframe ($117,938/$300,958 = 39%).
Approximately $14,204.75 of the funds transferred to
SUBJECT ACCOUNT 4 represent proceeds of the loan fraud
scheme described in this affidavit (39% x $38,000 check -
beginning balance of $615.25 = $14,204.75).

**J. SUMMARY OF SUBJECT ACCOUNT 1**

67.  Investigators obtained and reviewed records from
FRB for SUBJECT ACCOUNT 1 (as described above, funds up to
$124,500 in First Republic Bank account number
80009045743).  This account was opened on or about October
23, 2020, in the name of Anastasiya Rysik with Rysik listed
as the sole signer on the account.  From October 23, 2020
(account opening date) through December 31, 2020, $124,500
in proceeds traced to U.S. Medical's fraudulently-obtained
PPP loan were deposited into SUBJECT ACCOUNT 1.

68.  During the same time period, there were no
disbursements from this account and, as of December 31,
2020, the account had a balance of approximately
$124,500.24.

K. **SUMMARY OF SUBJECT ACCOUNT 2**

69.   Investigators obtained and reviewed records from
FRB for SUBJECT ACCOUNT 2 (as described above, funds up to
$120,000 in First Republic Bank account number
80009045941).  This account was opened on or about October
21, 2020, in the name of U.S. Medical Supply Inc., with
Rysik listed as the sole signer on the account.  From
October 21, 2020 (account opening date) through December
31, 2020, $120,000 in proceeds traced to U.S. Medical's
fraudulently-obtained PPP loan were deposited into SUBJECT
ACCOUNT 2.

70.   During the same time period, there were no
disbursements from SUBJECT ACCOUNT 2. As of December 31,
2020, the account had a balance of approximately $120,000.

L. **SUMMARY OF SUBJECT ACCOUNT 3**

71.   Investigators obtained and reviewed records from
FRB for SUBJECT ACCOUNT 3 (as stated above, funds up to
$4,450 in First Republic Bank account number 80008938278).
This account was opened on or about September 16, 2020, in
the name of DADYAN with DADYAN listed as the sole signer on
the account.  From September 16, 2020 (account opening
date) through December 31, 2020, $110,000 was deposited
into the account.  Ninety-six percent (96%) of deposits are
traced to proceeds of the wire fraud scheme described in
this affidavit. These deposits included the following:

| Date of Deposit | Amount of Deposit | Deposit from | Amount traced to loan fraud scheme | Fraudulent loan traced to |
|---|---|---|---|---|
| 9/17/20 | $15,000 | SUBJECT ACCOUNT 4 | $15,000 | Green Label |
| 10/19/20 | $70,000 | Secureline Realty | $70,000 | Escrow Six Star Secure Line |
| 10/23/20 | $25,000 | USB WLG x3501 | $20,250 | Western Lending |
| TOTAL = | **$110,000** | | **$105,250** | |

44.   Disbursements during the same time-period totaled approximately $106,224.09, of which $105,000 was a transfer to SUBJECT ACCOUNT 4 on November 6, 2020. $100,800 of the $105,000 transfer was attributable to fraud (96% x 105,000 = $100,800); therefore, approximately $4,450 of the fraud proceeds were not transferred to SUBJECT ACCOUNT 4 and remained in SUBJECT ACCOUNT 3 for use ($105,250 - $100,800 = $4,450). As of December 31, 2020, the account had a balance of approximately $3,775.95.

**M. SUMMARY OF SUBJECT ACCOUNT 4**

45.   Investigators obtained and reviewed records from FRB for SUBJECT ACCOUNT 4 (as described above, Funds up to $200,004.75 in First Republic Bank account number 80008938864).  This account was opened on or about September 16, 2020, in the name of AM & AM Financial

34

Services Inc., with DADYAN listed as the sole signer on the account. From September 16, 2020 (account opening date) through December 31, 2020, $243,000 was deposited into the account, of which $200,004.75 were proceeds traced the wire fraud scheme described in this affidavit. These deposits included the following:

| Date of Deposit | Amount of Deposit | Deposit from | Amount traced to loan fraud scheme | Fraudulent loan traced to |
|---|---|---|---|---|
| 9/17/20 | $100,000 | BOW Green Label x0531 | $85,000[1] | Green Label |
| 10/19/20 | $38,000 | BOA ABC x2061 | $14,204.75 | ABC Realty |
| 10/23/20 | $105,000 | SUBJECT ACCOUNT 3 | $100,800 | Green Label Escrow Six Star Secure Line Western Lending |
| TOTAL = | **$243,000** | | **$200,004.75** | |

46. Disbursements during the same time-period totaled approximately $27,525.52, including $15,000 in fraudulent Green Label EIDL loan proceeds transferred to SUBJECT ACCOUNT 3. As of December 31, 2020, SUBJECT ACCOUNT 4 had a balance of approximately $215,474.48.

---

[1] $100,000 deposit then $15,000 transferred to SUBJECT ACOUNT 3

47.   Law enforcement interviewed FRB personnel and learned that DADYAN had provided cashier's checks drawn on SUBJECT ACCOUNT 4 to her criminal defense attorney Fred Minassian ("Minassian"). Minassian attempted to deposit the cashier's checks into a trust account at WFB, but the checks were returned as unfunded due to SUBJECT ACCOUNT 4 having been frozen by FRB. This indicates that DADYAN is attempting to use fraudulently-obtained PPP and EIDL proceeds to pay for criminal defense fees, which is not a permissible use of PPP and EIDL funds under the programs and is itself fraudulent.

## V.   CONCLUSION

45.   The evidence set out in this affidavit demonstrates that there is probable cause to believe that during the time period May 2020 through August 2020, fraudulent loan applications were submitted to financial institutions and the SBA, in the names of U.S. Medical Supply, Green Label, Escrow Doc, Six Star, ABC Realty, Secureline Realty and Western Lending, in an attempt to obtain funds authorized by the CARES Act.  Based on the fraudulent loan applications submitted, these entities received proceeds of PPP and EIDL loans which were either directly or indirectly transferred to SUBJECT ACCOUNTS.

46.   Based on the foregoing, there is probable cause to believe that SUBJECT FUNDS constitute or were derived from proceeds traceable to one or more violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1344 (Bank

Fraud), and are therefore subject to seizure pursuant to 18 U.S.C. § 981(b), and forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 984.  In addition, there is probable cause to believe that the SUBJECT FUNDS are subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. § 982(a)(7) and 21 U.S.C. 853(f), because the funds would, in the event of conviction on the alleged underlying offenses, be subject to criminal forfeiture, and an order under section 21 U.S.C. § 853(e) would not be sufficient to assure the availability of the property for forfeiture.

_Justin Palmerton_
JUSTIN PALMERTON
Special Agent
FEDERAL BUREAU OF
INVESTIGATION

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 2nd day of
February 2021.

_____
HONORABLE _____
UNITED STATES MAGISTRATE JUDGE